# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| In re: | CONSOLIDATED CASE NOS. |
| THE CELOTEX CORPORATION, et al., | Case No. 90-10016-8G1 |
| | Case No. 90-10017-8G1 |
| Debtors. | Chapter 11 |

## ANNUAL REPORT, SUMMARY OF CLAIMS DISPOSED, FINANCIAL STATEMENT, AND ACCOUNT OF THE TRUSTEES OF THE ASBESTOS SETTLEMENT TRUST FOR THE PERIOD JANUARY 1, 2006 TO DECEMBER 31, 2006

# TABLE OF CONTENTS

I.   GENERAL ...................................................................................................................1

    A.   Purpose and Contents ...........................................................................................1

    B.   Background on Bankruptcy Cases and the Trust ...............................................1

    C.   Governing Provisions of the Trust Agreement .................................................2

II.  TRUST ADMINISTRATION ...................................................................................3

    A.   Trustees ...................................................................................................................3

    B.   Trust Officers ........................................................................................................4

    C.   Trust Auditors .......................................................................................................4

    D.   Trust's Wilmington Claims Processing Facility ...............................................5

    E.   Trust Advisors .......................................................................................................8

    F.   Investment Management .......................................................................................8

    G.   Professional Fees and Expenses .........................................................................10

III. PAYMENT PERCENTAGE .....................................................................................10

    A.   Governing Provisions .........................................................................................10

    B.   Consideration of the Payment Percentage .......................................................10

IV.  SUMMARY OF CLAIMS DISPOSED ....................................................................11

    A.   PI Claims Administration ...................................................................................11

    B.   PD Claims Administration ..................................................................................16

    C.   Status of Disputed PD Claims ............................................................................17

V.   TRUST ASSETS .......................................................................................................19

    A.   Celotex ..................................................................................................................19

VI.  TRUST LITIGATION AND CONTINGENT ASSETS ...........................................20

    A.   Insurance Litigation ............................................................................................20

    B.   Supersedeas Bond Adversary Proceeding .......................................................23

VII. THE FAIR ACT .......................................................................................................24

Frank Andrews, Sharon M. Meadows, and James W. Stevens, the trustees of the Asbestos Settlement Trust (the "**Trust**"), created pursuant to the Modified Joint Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code for the Celotex Corporation and Carey Canada Inc. ("**Plan of Reorganization**"), submit this Annual Report, Summary of Claims Disposed, Financial Statement, and Account for the calendar year ended December 31, 2006.

## I.    GENERAL

### A.    Purpose and Contents

The purpose of this Annual Report, Summary of Claims Disposed, Financial Statement, and Account is to fulfill the financial reporting requirements of the Second Amended and Restated Asbestos Settlement Trust Agreement (the "**Trust Agreement**"); to report on the actions taken and obligations incurred on behalf of the Trust by its trustees during the period January 1, 2006 to December 31, 2006 (the "**Reporting Period**"); and to provide the basis for the Court's discharge of the trustees from liability as to any matter disclosed herein as provided in Article 5.12 of the Trust Agreement.

### B.    Background on Bankruptcy Cases and the Trust

On October 12, 1990, The Celotex Corporation, and its wholly owned subsidiary, Carey Canada Inc., filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code.  The Chapter 11 cases of Celotex and Carey Canada (the "**Bankruptcy Cases**") were consolidated for procedural purposes and jointly administered pursuant to an order of the Court. On December 6, 1996, the Court entered an order in these cases confirming the Plan of Reorganization.  On March 4, 1997, the United States District Court for the Middle District of Florida adopted and affirmed this Court's confirmation order.  On May 30, 1997 (the "**Effective Date**") the Plan of Reorganization became effective and the trustees began to operate the Trust.

Through a series of transactions on and shortly after the Effective Date, the Trust was funded with the stock of Celotex Corporation, Carey Canada, Walter Industries, and JWC, along

with significant amounts of cash and the expected proceeds from certain litigation. The purpose of the Trust is to assume the asbestos liabilities of Celotex Corporation, and its affiliates, and to use the assets of the Trust to pay all the asbestos claimants of these companies, both present claimants and future claimants, on a substantially equivalent basis.

### C.      Governing Provisions of the Trust Agreement

The Annual Report, Summary of Claims Disposed, Financial Statement, and Account are filed in compliance with the following provisions of the Trust Agreement.

Article 3.2 (c) of the Trust Agreement provides:

### 3.2      General Administration.

(c)      (i)      The trustees shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual report containing financial statements of the Trust (including, without limitation, a balance sheet of the Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent certified public accountants selected by the trustees and accompanied by an opinion of such firm as to the fairness of the financial statements' presentation of the cash and investments available for the payment of claims and as to the conformity of the financial statements with the special-purpose accounting methods adopted by the trustees.  The trustees shall provide a copy of such report to the TAC, the Legal Representative, the PDCA, the PD Advisory Committee (collectively, the **"Approving Entities"**) and Reorganized Celotex when such reports are filed with the Bankruptcy Court.

(ii)      Simultaneously with delivery of each set of financial statements referred to in Article 3.2(c)(i) above, the trustees shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of claims disposed of during the period covered by the financial statements.  The trustees shall provide a copy of such report to the Approving Entities and Reorganized Celotex when such report is filed.

Article 5.5 of the Trust Agreement provides:

### 5.5      Compensation and Expenses of Trustees.

(a)      Each of the trustees shall receive compensation from the Trust for his or her services as Trustee in the amount of $50,000 per annum, plus a per diem allowance for meetings or other Trust business attended in the amount of $2,000. [1]

---

[1] As previously reported, pursuant to Article of the Trust Agreement, the trustees' per annum compensation was increased from $50,000 to $60,000 in 2005.

The trustees shall determine the scope and duration of activities that constitute a meeting and, if the trustees elect to provide for payment for activities of less than a full day's duration, may provide for partial payment of per diem amounts on a proportional basis for activities of less than a full day's duration. The per annum compensation payable to the trustees hereunder shall be reviewed every three (3) years and increased with the consent of the TAC and the Legal Representative.

(b)     The Trust will promptly reimburse all trustees and the Chairperson for all reasonable out-of-pocket costs and expenses incurred by the trustees in connection with the performance of their duties hereunder.

(c)     The Trust will include in the report to be filed pursuant to Article 3.2(c)(i) of this Trust Agreement, and in a separate annual report to be filed in the same manner, a description of the amounts paid under this Article 5.5.

Article 5.12 of the Trust Agreement provides:

**5.12    Settlement of Trustees' Accounts**.  Notwithstanding any state law to the contrary, the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the trustees, whether such account is rendered by the trustees themselves or is sought by any other person. The trustees shall render successive accounts covering periods ending at the end of each calendar year consisting of the filings required by Article 3.2(c) of this Trust Agreement. In addition, an account shall be rendered for the period ending on the date of the death, resignation, removal or retirement of any Trustee. Upon the approval of any such periodic account by the Bankruptcy Court after hearing on notice to the Approving Entities and such other parties as the Bankruptcy Court may designate, and subject to the terms of the order of the Bankruptcy Court granting such approval, the trustees shall be discharged from any further liability or responsibility as to all matters disclosed in such periodic account, and an action against a trustee for breach of trust arising out of any matter disclosed in such periodic account shall be barred as provided in Fla. Stat. Ann. §737.307.

## II.    TRUST ADMINISTRATION

### A.    Trustees

Frank Andrews, Sharon M. Meadows, and James W. Stevens served as the trustees of the Trust during the Reporting Period. Section 5.1 of the Trust Agreement provides that one trustee shall be designated chairperson annually by a vote of the trustees. Mr. Andrews continued to serve as chairperson of the Trust during the Reporting Period.

During the Reporting Period the trustees held four formal meetings of the Trust. These meetings were designated by the trustees as "regular meetings" under the Trust's bylaws.

Outside the formal meetings, the trustees conferred among themselves most weeks during the Reporting Period on a regularly scheduled conference call, and individual trustees often met on Trust business throughout the Reporting Period with advisors to the Trust.

The compensation paid to the trustees during the Reporting Period is set forth in a supplemental schedule to the Trust's audited financial statement, which is attached as **Exhibit 1**. The filing of the supplemental schedule on compensation satisfies the requirements of Article 5.5(c) of the Trust Agreement.

In compliance with Article 5.5 of the Trust Agreement and the Trust's guidelines for payment of trustee fees and expenses, the Trust paid the trustees' compensation and reimbursed their expenses on a quarterly basis. As part of an *in camera* filing made in connection with this report ("***In Camera* Submission**"), the Trust has supplied the Court with the time and expense records of the trustees for the Reporting Period and a copy of the Trust's guidelines for payment of trustee fees and expenses.

### B.     Trust Officers

During the Reporting Period John L. Mekus continued to serve as Executive Director of the Trust, and Richard R. Winner continued as Chief Operating Officer of the Trust. Catherine Toolin was hired by the Trust in 2006 to serve as Chief Financial Officer.

### C.     Trust Auditors

During the Reporting Period the Trust changed auditors. After years of reliable service from PriceWaterhouseCoopers, the Trustees decided they could obtain the same high quality service from a smaller firm at a lower price. The Trustees selected the firm of Argy, Wiltse & Robinson, P.C. of McLean, Virginia. The Argy firm has significant experience auditing asbestos personal injury trusts. The audited financial statements covering the Reporting Period accompanying this Report were prepared by the Argy firm.

## D.  Trust's Wilmington Claims Processing Facility

As previously reported, the Trust has operated a stand-alone claims processing facility in Wilmington, Delaware for the processing and payment of the Trust's asbestos-related personal injury claims.  The Trust's claims facility has gained a reputation for fair, efficient, and cost-effective claims processing.  As the Trust's backlog of claims was reduced, and as new filings have diminished, the trustees have been cognizant of the relative increase in claims processing costs in proportion to the number of claims processed.  The trustees considered available options to reduce claims processing costs, such as closing or reducing the size of its stand-alone facility, contracting with a third-party to process its claims, or joining with other asbestos-related personal injury trusts in some joint processing arrangement whereby overhead and other common costs could be shared.  The trustees decided that the best alternative was to keep its experienced claims staff and physical facilities intact while looking for opportunities to jointly process claims with other asbestos personal injury trusts and thereby share the costs of the claims facility.  The timing was especially good for this approach.  In 2006 four new, large asbestos trusts were formed at the conclusion of the chapter 11 proceedings for Babcock & Wilcox Company, Armstrong World Industries, Inc., Owens Corning Fibreboard Company, and United States Gypsum Company.

In the first part of 2006 the Trust entered into a claims processing agreement (the "**B&W Agreement**") with the Babcock & Wilcox Company Asbestos PI Trust, a Delaware statutory trust (the "**B&W Trust**") to process its asbestos-related personal injury claims for a fixed-price per claim.  In addition, also in the first part of 2006, the Trust entered into an agreement with DII Industries, LLC Silica PI Trust to process its silica-related personal injury claims for a fixed price per claim.

In September 2006, the Trust was approached by three additional asbestos trusts: the Armstrong World Industries, Inc. Personal Injury Settlement Trust, a Delaware trust, the United

States Gypsum Asbestos Personal Injury Settlement Trust, a Delaware trust, and the Owens Corning Fibreboard Asbestos Personal Injury Settlement Trust, a Delaware trust. Initially, these three trusts sought a contractual arrangement with the Celotex Trust whereby their claims would be processed by the Trust under terms similar to the B&W Agreement. At the Celotex trustees' urging, an agreement was reached whereby these three trusts, the Celotex Trust, and the B&W Trust would all jointly process claims through their common ownership of the Celotex Trust's claims facility.

Accordingly, the Trust formed the Delaware Claims Processing Facility, LLC, a Delaware limited liability company (the "**Delaware Claims Facility**"). Effective November 1, 2006, the Trust contributed substantially all its claims processing assets, excluding the Trust's proprietary electronic processing system *Trust On-line*, to the Delaware Claims Facility in exchange for a 20% interest in the LLC and the assumption by the Delaware Claims Facility of the Trust's obligations relating to the claims processing assets after November 1, 2006. Effective November 1, 2006, each of the Celotex Trust, the B&W Trust, the Armstrong Trust, the Owens Corning Fibreboard Trust, and the United States Gypsum Trust (the "**Member Trusts**") entered into a limited liability company agreement, pursuant to which each Member Trust owns a 20% interest in the Delaware Claims Facility. In addition, each Member Trust entered into a claims processing agreement with the Delaware Claims Facility to process each Member Trust's asbestos-related personal injury claims. Under the terms of each Member Trust's claims processing agreement, the Delaware Claims Facility will process each Member Trust's claims in accordance with that Trust's applicable governing documents. Based on each Member Trust's usage of the claims facility's resources, each pays a *pro rata* portion of the claims facility's cost.

The Delaware Claims Facility also assumed the Celotex Trust's fixed-price, claims processing agreement with DII Industries, LLC Silica PI Trust. This trust has a very small number of claims.

In effect, the Delaware Claims Facility operates on a not-for-profit or cost pass through basis. The trustees determined that the economies of scale obtained by the five asbestos trusts sharing a claims processing facility would provide significant savings in the Celotex Trust's future claims processing expenses, and furthermore would avoid the approaching difficult decisions the trustees faced over whether to scale down its claims facility staff as its claims volume leveled off. The savings, when compared to what the trustees projected the Celotex Trust would have spent to continue processing claims through a stand-alone entity, were substantial on both an annual and an aggregate basis.

The Trust granted the Delaware Claims Facility an exclusive, irrevocable, and perpetual license to use and modify *Trust On-line* in the Delaware Claims Facility's business operations. The Delaware Claims Facility may sublicense *Trust On-line* to departing Member Trusts only to process such Member Trust's claims. The Trust is entitled to receive $900,000 in licensing fees in the event that occurs. The Trust also leased all its employees to the Delaware Claims Facility effective November 1, 2006 until January 1, 2007, to avoid adversely affecting employee benefit-related obligations applicable to the Trust employees. On January 1, 2007, all the Trust employees were hired by the Delaware Claims Facility. As a result, John Mekus and all the other officers of the Trust are now employees of the Delaware Claims Facility.

Pursuant to the terms of the LLC Agreement, the Delaware Claims Facility is governed by a board of managers. Each Member Trust annually selects one manager to serve on the Delaware Claims Facility's board. The members of the board of managers, if compensated as managers, will be compensated by their respective Member Trusts, not the Delaware Claims Facility. The Trust's current representative on the Delaware Claims Facility's board of managers is Frank Andrews. The initial Executive Director of the Delaware Claims Facility is John Mekus.

### E. Trust Advisors

Under the terms of the Trust Agreement, there are three advisory groups who participate in the affairs of the Trust. These are the Property Damage Advisory Committee ("**PD Advisory Committee**"), consisting of three property damage lawyers, Daniel A. Speights, Martin W. Dies, and Karen Cordry; the Trust Advisory Committee ("**PI Advisory Committee**"), consisting of four personal injury lawyers, Russell Budd, Steven Kazan, Joseph F. Rice and Gary W. Kendall; and the Legal Representative for Unknown Claimants, James L. Patton ("**Legal Representative**"). These advisory groups attended the June meeting of the trustees during the Reporting Period.

During the Reporting Period, James L Patton, Jr. replaced David Shrager as Legal Representative. As previously reported, Mr. Shrager, who had served as the Legal Representative since the Trust's inception, passed away on November 28, 2005. Pursuant to Article 6.3 of the Trust Agreement, Mr. Patton was unanimously nominated by the trustees to replace Mr. Shrager. By motion dated January 31, 2006, the Trustees moved the Bankruptcy Court for an order approving the appointment of Mr. Patton as the succeeding Legal Representative. A hearing on the motion was held on March 27, 2006, and by order dated May 8, 2006, the Court approved the appointment of Mr. Patton as Legal Representative.

### F. Investment Management

As previously reported, the Trust retained the firm of Cambridge Associates, LLC ("**Cambridge**") as its investment/asset management advisory firm. Guided by Cambridge, during the Reporting Period the trustees reviewed and adopted a new target asset allocation for the three segments of the Trust's investment portfolio: 30% short term municipal bonds; 45% total return (intermediate-term) municipal bonds; and 25% equities. Within the equity allocation, 15% is U.S. equities and 10% is non-U.S. equities. The target allocation is heavily weighted toward non-taxable securities because the Trust, like every qualified settlement fund, is subject

to the highest corporate tax rate on all its investment income. With Cambridge's assistance, separate investment managers were selected to manage each segment of the Trust's investment portfolio. During the Reporting Period, Brown Brothers Harriman served as the manager of the short-term municipal bond portfolio. (Brown Brothers continues to serve as the custodian of all Trust funds and the Trust's commercial bank, as well.) Both Goldman Sachs and Brown Brothers served as managers of the intermediate-term municipal bond portfolio, with the portfolio split equally between them. John W. Bristol (U.S. growth manager) and Grantham, Mayo, Van Otterloo (U.S. value manager), and McDonald Capital (U.S. value manager) served as managers of the U.S. equity portfolio. Hansberger Global Investors (non-U.S. growth manager and Sanderson Asset Management (non-U.S. value manager) served as managers of the non-U.S. equity portfolio.

The trustees developed investment guidelines consistent with Article 4 of the Trust Agreement. These guidelines are frequently reviewed and periodically updated by the trustees with Cambridge's assistance. The guidelines state that the average bond portfolio quality must be AA or better at all times, with a minimum quality of investment grade or the equivalent by one nationally recognized statistical rating organization for any single security. The bond portfolios are diversified as to individual issuer and sector, and the credit quality remains very high in the portfolio relative to the stated benchmark. The current version of the Trust's investment guidelines is attached as **Exhibit 2.**

During the Reporting Period, the trustees received detailed monthly reports from Cambridge on the performance of the Trust's investment portfolio and regularly conferred with representatives of Cambridge. The trustees met in person with and formally reviewed the performance of each of the Trust's investment managers.

In 2006 the total Trust investment portfolio returned 6%, net of investment managers' fees. Municipal bond returns have not been adjusted to reflect pre-tax equivalent returns.

### G.   Professional Fees and Expenses

During the Reporting Period, the Trust paid $5,739,676 in professional fees and expenses. All professional fees and expenses are reviewed by the trustees and/or the Trust staff for compliance with the Trust's professional fee and expense guidelines. A copy of the Trust's fee and expense guidelines is part of the *In Camera* Submission. The professional fees and expenses are set forth and itemized in a supplemental schedule to the Trust's 2006 financial statement, which is attached as **Exhibit 1**.

## III.   PAYMENT PERCENTAGE

### A.   Governing Provisions

The Trust is a limited fund. None of the asbestos claimants who are beneficiaries of the Trust will have their claims paid in full. Instead, they will be paid some percentage (the **"Payment Percentage"**) of the liquidated amount of their claims. The trustees are charged with the duty of periodically determining the Payment Percentage by considering, on the one hand, estimates of the number, types, and values of present and expected future claims and, on the other hand, the value and liquidity of the Trust's assets.

Pursuant to Article 3.4(b) of the Trust Agreement, during the first two years of the Trust's operation the Initial Payment Percentage, as defined in the Plan of Reorganization, could be relied upon by the trustees in paying claimants. The Plan set the Initial Payment Percentage at twelve per cent (12%). (Plan of Reorganization, at Article 1.85.)

### B.   Consideration of the Payment Percentage

Pursuant to Article 3.4(a) of the Trust Agreement, the trustees must periodically reconsider the determination of the Payment Percentage. The language of that provision provides that

> "after the second anniversary of the Effective Date [of the Plan of Reorganization], but no less frequently than once every two (2) years, the trustees shall consider their determination of the Payment Percentage to assure that it is

based on credible, current information and forecasts, and may, after such consideration, change the Payment Percentage."

As previously reported, after the second anniversary of the Effective Date the trustees set the Payment Percentage at 12%. This Payment Percentage was used throughout 1999 and 2000. In 2001, after the fourth anniversary of the Effective Date, the trustees determined to lower the Payment Percentage from 12% to 10%, effective that date. The trustees also decided in 2001 that thereafter they would consider the Payment Percentage determination on an annual basis. Consistent with this decision, in 2002 the trustees approved an upward adjustment of the Payment Percentage to 11.3%, and in 2003, 2004, and 2005 the trustees determined that the Payment Percentage would remain at 11.3%.

During the Reporting Period, the trustees again considered whether the Payment Percentage should be adjusted. On July 31, 2006 the trustees determined to increase the Payment Percentage to 14.1%.

## IV. SUMMARY OF CLAIMS DISPOSED

### A. PI Claims Administration

#### 1. Summary of Claims Processed

As of December 31, 2006, the Trust had received approximately 639,185 personal injury claims. During the Reporting Period the Trust paid 72,836 personal injury claims in the aggregate amount of $98,942,480.[2] Since inception the Trust has made 402,937 payments on 305,128 personal injury claims in the aggregate amount of $575,393,617.51.[3] A summary showing the number and amount of claims, including personal injury claims, paid by the Trust

---

[2] For accounting purposes, the full amounts of Individually Reviewed Claims ("IRC") are expensed in the period in which the claims are settled. Final installments due on IRC represent a reserve established to record the liability for future payments. One half of the payment is made upon settlement, and the second payment is expensed and the reserve is established. Two years following the first payment, the second installment is paid to the claimant. This payment is charged to the previously established reserve. In 2006, $112,559,550 in personal injury claims was paid in cash to claimants. As reflected in the financial statements of the Trust, $98,942,480 in actual claims payments were made with a $13,625,570 charge to the second payment reserve.
[3] This amount does not include the second installment payments due on individually reviewed claims, which are paid two years after the claim is allowed and the first installment paid.

-11-

during the Reporting Period is attached as **Exhibit 3.** This summary is filed in fulfillment of the requirement contained in Article 3.2(c)(ii) of the Trust Agreement.

### 2. Hold on Claims Relying on Certain Doctors and Screeners

As previously reported, on June 30, 2005, the United States District Court for the Southern District of Texas, after a *Daubert* hearing in the multi-district silica products liability litigation ("**Silica MDL**"), entered an order and opinion that disqualified two doctors from providing testimony relating to silica diagnoses.[4] Although no asbestos claims were before that court, the opinion contained comments that challenged the diagnostic practices of these two doctors and some others, including certain medical testing companies. Some of these same medical professionals challenged in the Silica MDL proceedings also provided medical reports for claimants involved in asbestos litigation and have regularly provided medical reports submitted by claimants of asbestos trusts, including the Celotex Trust.

In July, 2005, in order to enable the Trust to examine the ramifications of the June 30 opinion by the Silica MDL court, the Trust placed an administrative hold on all claims that relied in any way upon medical reports by any of the doctors or medical testing companies challenged in the Silica MDL proceedings. This hold extended to claims in process, claims settled but not yet paid, and claims settled but paid only the first of two installment payments. The held claims were identified by a match of the challenged doctors or medical testing companies against the Trust's personal injury claims database. In effect, this meant that a challenged doctor or medical testing company's name appeared in a claim file and was captured in a data base field. The identification did not establish that reports supplied by them necessarily determined the allowance of the claim. [5]

---

[4] *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563 (D. Tex. 2005).
[5] Very often, asbestos personal injury claims in litigation are supported by medical reports from multiple doctors or medical testing firms. For example, one may supply a report on a claimant's physical examination or medical history, another may supply a report on a radiographic (x-ray) examination, another may supply a report on a pulmonary function test, and yet another doctor may supply the diagnosis of asbestos related disease.

At the trustees' instructions, over the next few months the Trust's staff and professionals reviewed the public record of the Silica MDL proceedings; directed a systematic, as opposed to random, audit of the medical evidence submitted by the medical professionals challenged in the Silica MDL proceedings; and conferred with other asbestos trust claims processing facilities on the import of the Silica MDL court's opinion.

The Trust's staff and professionals reported to the trustees on the results of their review at the September 2005 meeting of the trustees,. Although the practices of the medical professionals criticized by the Silica MDL court arose in the context of diagnosing silica diseases and not asbestos diseases, as a result of parallels in the practices of a few of these medical professionals when diagnosing asbestos diseases, after the September 2005 meeting the trustees proposed that until further notice, as a prophylactic measure, the Trust would no longer accept medical reports from Doctors Raymond Harron, Andrew Harron, James Ballard, Barry Levy, Kevin Cooper, Glynn Hilbun, George Martindale, W. Allen Oaks and Todd Coulter, as well as the testing companies Respiratory Testing Services, Inc., Netherland & Mason, Inc., and Occupational Diagnostics. (These doctors and medical testing companies comprise all those challenged in the Silica MDL court's opinion.) Further, the trustees proposed that until further notice the Trust would reject as deficient any pending claims for which allowance depended upon a report by these same medical professionals, with the understanding that the deficiency could be cured by the claimant's submission of additional medical reports from different medical professionals. Finally, the trustees proposed that until further notice payment of similarly determined claims that had already been settled by the Trust, for which either a release had been received and/or a second installment payment was due, would be placed on administrative hold with the same understanding that the hold could be lifted by the claimant's submission of additional medical reports from different medical professionals.

Before taking any formal action on these proposals, and as required by the PI Claims Resolution Procedures governing the administration of personal injury claims, the trustees conferred with the PI Advisory Committee and the Legal Representative. The Trust also provided counsel to the PD Advisory Committee with an early draft of a notice that explained the Trust's proposed actions regarding the challenged medical professionals.

The PI Advisory Committee took exception with the Trust's proposed course of action. The committee objected to the proposed administrative hold on settled claims altogether; it acquiesced in the proposed prophylactic measure of refusing to accept further reports from the challenged medical professionals, but wanted it to be done prospectively without affecting pending claims; and it requested that both pending and settled claims be reviewed by the Trust to determine whether medical reports independent of those submitted by any challenged physician supported the allowance of the claim.

As previously reported, after considering the views of the Trust advisory groups, the Trust went forward with its proposed actions. On October 18, 2005 a formal notice was sent out to claimants. This notice is attached as **Exhibit 4**. It explained that until further notice (a) payment of all affected settled claims would be placed on administrative hold, which could be lifted upon the claimant's submission of additional medical reports, (b) all affected claims pending as of July would be rejected as deficient, and (c) all affected claims filed thereafter would be rejected as deficient.[6] In addition, to address the PI Advisory Committee's concerns, the Trust conducted a review of affected claims to determine whether support for allowance of a claim could be determined from reference to other medical information submitted separately

---

[6] As previously reported, the Trust's staff identified 50,000 claims previously rejected as deficient, or placed on hold for other reasons, that have some type of medical report or test result from one of the challenged medical professionals. The Trust's staff also determined that in the years prior to the Silica MDL court's ruling, over 30,000 claims having some type of medical report or test result from a challenged medical professional had been allowed or paid by the Trust. To put these numbers in context, there have been approximately 625,000 personal injury claims filed against the Trust and approximately 300,000 of them have been allowed or paid.

from the medical report of any challenged physician. That review was still in progress at the end of the reporting period covered by the 2005 annual report.

The Trust's review focused on the approximately 15,000 settled claims for which the Trust had suspended payment of the final installment of the settlement amount because the claims data base indicated a report in the claims file by a challenged medical professional. The TAC's position was that no settlements could be rescinded by the Trust after the first installment payment had been made; the Trust disagreed. At the Trust's annual meeting in June 2006, which was attended by all the Trust Advisers, counsel to the Trust explained the results of the Trust's review of the affected settled claims and offered an alternative method, ultimately acceptable to the TAC, by which the suspension of final payment could be lifted.

As the Trust's counsel explained, of the approximately 15,000 settled claims reviewed, the Trust's staff determined that approximately 6,700 claims had sufficient medical evidence of asbestos disease to permit payment under the claims procedures without reliance upon a report by a challenged medical professional.[7] The Trust's staff determined, however, that the remaining approximately 9,300 claims required reliance upon a medical report from a challenged medical professional for allowance of the claim, and final payment of these claims would remain on hold until a new medical report was submitted.

As the Trust's counsel further explained, the Trust proposed a method to lift the suspension of payment that would not require all 9,300 claimants to be reexamined by a new medical professional. The Trust would design a sampling program whereby a representative sample of these settled claims would be selected, and the affected claimant required to submit

---

[7] For example, in some instances a challenged medical professional, like a B-Reader, provided an x-ray report, but the claim file also included a diagnosis by a physician who noted in his report his review of the x-ray and his separate conclusion that it evidenced asbestos related disease; in other instances the claimant provided a medical report from a challenged medical professional that was not required for the disease category, like a PFT report when PFT readings were not required under the claims procedures for the disease category claimed; in other instances; and in a small number of instances the claimant was deceased and a new medical report could not be obtained, in which case the Trust determined it would not attempt to rescind the settlement.

new medical evidence or written verification from the challenged medical professional of compliance with accepted medical standards in connection with any medical evidence submitted to the Trust to support the settled claim. Based on the new submissions received on the sample claims, the Trust would make determinations by law firm and by listed medical professional with respect to lifting the suspension of payment on the final installment of the settlement amount. This sampling program was underway at the end of the Reporting Period.

### B.    PD Claims Administration

W. D. Hilton, Jr. served as the Property Damage Claims Administrator ("**PD Claims Administrator**") for the Trust. As previously reported, Mr. Hilton established the Property Damage Claims Facility (the "**PD Facility**") prior to the Effective Date. The PD Facility shared facilities with the National Gypsum Corporation Bodily Injury Trust, the Fuller-Austin Asbestos Settlement Trust, and five smaller asbestos and silica trusts.

In processing the property damage claims, the PD Claims Administrator consulted with the Property Damage Advisory Committee as required by the Asbestos Property Damage Claims Resolution Procedures and the Trust Agreement. The PD Claims Administrator retained the law firm of Bilzen, Sumberg, Dunn, Baena, Price & Axelrod LLP as legal counsel.

As previously reported, the PD Facility received approximately 4,800 claims. The PD Facility recorded most claims by individual building for which property damage was claimed. The actual number of property damage claimants, therefore, was much smaller.

The PD Facility completed its review and determination of all the submitted property damage claims in 2005. On September 25, 2006, W.D. Hilton, Jr. as the PD Claims Administrator submitted his final report regarding the determination of all asbestos property damage claims asserted against the Trust.

The PD Claims Administrator was compensated pursuant to the terms set forth in Article 8.6 of the Trust Agreement. He was paid on a quarterly basis and the amounts paid to him

during the Reporting Period are set forth in a supplemental schedule to the Trust's 2006 financial statement, which is attached as **Exhibit 1**. On September 15, 2006, the Trust and the PD Claims Administrator entered into a joint stipulation resolving, among other things, the amount of monthly compensation to be paid the PD Claims Administrator in 2006 and the amount of the incentive bonus be paid to the PD Claims Administrator. The Trust filed a motion seeking approval of the stipulation regarding the PD Claims Administrator's compensation, incentive bonus, and related matters. The Court entered an order on October 18, 2006, approving the stipulation between the parties.

During the Reporting Period, the Trust did not pay any property damage claims.[8] Since inception the Trust has paid 2,641 property damage claims in the aggregate amount of $147,649,270.05.

As of December 31, 2006, the Trust had received 2,872 requests for payment of property damage claims. Of these, 2,285 had been paid (or settled) and 587 had been held as "disputed" by the Trust.[9]

### C. Status of Disputed PD Claims

As reported in the trustees' 1999 annual report, in 1999 the Trust performed a claims audit ("**PD Claims Audit**") of the PD Facility in order to assure the trustees that property damage claims presented to the Trust for payment by the PD Claims Administrator met the standards set forth in the Trust Agreement and the PD Claims Procedures. The PD Claims Audit was concluded in late November 1999, and thereafter the Trust began paying property damage claims not affected by certain issues raised by the PD Claims Audit.

---

[8] During the Reporting Period, the Trust did make an additional payment to the National Schools Class pursuant to the settlement of the National Schools Class asbestos property damage claim.

[9] Included in the number of claims paid are 1,530 Category 4 property damage claims, 23 property damage claims settled under the Voluntary Liquidation Program, 425 property damage claims paid in the Dies Settlement, 63 property damage claims paid through other settlements, and 4 property damage claims for which the first payment was made and then the claims were settled. Certain settlements included property damage claims that had not been submitted for payment to the Trust by the PDCA.

As a result of certain issues raised by the initial PD Claims Audit and the Trust's subsequent reviews of claims files, the Trust determined that certain types of PD claims had been allowed for payment by the PD Claims Administrator in contravention of the PD Claims Procedures. Accordingly, the trustees exercised their discretion and did not pay these disputed claims. Pursuant to procedures ordered by this Court, the Trust formally stated its grounds for disputing payment of these types of PD claims in notices provided to claimants and subsequent filings with the Court. As of the end of the Reporting Period, the Trust was withholding payment on 587 "disputed" claims pending resolution. The Trust's grounds for withholding payment have been fully set forth in the Trust's pleadings filed with this Court in connection with the disputed claims.

In several decisions, this Court has ruled that some of the disputed claims should be paid by the Trust. The Trust has appealed each of these decisions to the United States District Court for the Middle District of Florida. On April 22, 2005, the District Court issued an opinion affirming the opinion of this Court in the dispute involving the City of New York. The Trust appealed this decision to the United States Court of Appeals for the Eleventh Circuit. This appeal is pending.

The separate appeals that remain before the District Court involve disputed claims held by the Federal Lessors class action, the State of Illinois, and the State of Utah. The District Court has stayed each of these appeals pending the outcome of the Trust's appeal to the Eleventh Circuit of the NYC disputed claims. All other remaining disputes over payment of property damage claims are pending before this Court in separate adversary proceedings. The TAC, the Legal Representative, and the PD Advisory Committee have intervened in each of the proceedings remaining before the Court as well as certain of the proceedings before the District Court.

## V. TRUST ASSETS

All the Trust's assets are reflected in the Trust's 2006 financial statements, which have been audited by Argy, Wiltse & Robinson, P.C. and is attached at **Exhibit 1**. The financial statement was prepared in accordance with special purpose accounting rules adopted by the trustees. The preparation of the financial statements by an independent accounting firm and the filing of it with the Bankruptcy Court satisfies the requirements of Article 3.2(c)(i) of the Trust Agreement.

### A. Celotex

As previously reported, John L. Laeri, Jr., one of two directors of Celotex Corporation and financial advisor to the Trust, passed away on February 2, 2005. Upon the suggestion of George N. Wood, the remaining director, former senior vice president, general counsel and secretary of the company, the trustees asked Gail King of Keating Muething & Klekamp PLL to replace Mr. Laeri as the second member of the Board of Directors. Ms. King has worked closely with Mr. Wood since the sale of Celotex's businesses, and her knowledge of the sales and other Celotex matters well qualifies her to serve in this capacity. Since her election, Ms. King has attended the Trust's regular meetings and reported on the status of Celotex Corporation. In accordance with a prohibition in the Trust Agreement, the trustees do not serve as directors of the company.

As of the end of the Reporting Period, the company had five (5) employees, comprised of four (4) full-time employees and one (1) part-time employee. The company currently has four (4) full-time employees.

During the Reporting Period, Celotex continued the process of winding up its corporate affairs. The company continued to manage its assets, including its financial investments, its former research and development facility, and other former industrial real estate. The company also continued to administer various benefit plans relating to former employees and to address its

potential liabilities, including certain matters that are the subject of ongoing litigation. It is anticipated that the company shall continue, through at least 2007, the process of winding-up its corporate affairs, managing its assets, and addressing its potential liabilities.

Effective August 31, 2004, the company adopted a plan of liquidation and made a partial liquidating distribution to the Trust in the amount of $377,524,000 in cash and investments. In addition to other assets, the company retained $50,000,000 in cash and investments. No additional partial liquidating distributions were made to the Trust in 2005 and 2006. Upon complete liquidation of the company, any remaining assets will be transferred to the Trust.

As of 2003, Celotex Corporation's financial statements were no longer audited separately and, therefore, are not included in the *In Camera* submission accompanying this annual report. Celotex Corporation's financial data and internally prepared financial statements, however, are audited in connection with the preparation of the audited financial statements of the Trust.

## VI. TRUST LITIGATION AND CONTINGENT ASSETS

### A. Insurance Litigation

Since the Trust's inception in 1997, the attorneys of Gilbert Randolph LLP ("**Gilbert Randolph**") have continually represented the Trust in insurance coverage related matters. The Trust entered into a fee agreement with the Gilbert Randolph firm whereby the firm agreed to bill the Trust a discounted percentage of its hourly fees until a baseline recovery is achieved. In addition, the Gilbert Randolph firm was to receive a performance incentive in the event it was able to achieve an outstanding result for the Trust. Due to successful insurance recoveries to date, Gilbert Randolph earned the 25% fee hold-back pursuant to the terms of their engagement. The Trust paid the Gilbert Randolph and Dickstein Shapiro firms hold-backs of $2.3 million and $1.8 million, respectively.

During the Reporting Period, the attorneys at Gilbert Randolph pursued on behalf of the Trust insurance coverage for asbestos-related bodily injury and property damage claims in a number of proceedings, including the following:

*Insurance Adversary Proceeding.* In 1998 the Trust appealed the Bankruptcy Court's judgment in favor of the insurers in the Insurance Adversary Proceeding regarding coverage for asbestos-related bodily injury and property damage claims. The District Court heard oral argument on March 2, 2000, and in August 2006 affirmed the Bankruptcy Court's judgment. The Trust has appealed to the United States Court of Appeals for the Eleventh Circuit. The Trust filed its brief in December 2006. The Court of Appeals has not yet rendered a decision.

*Wellington ADR Proceedings.* In 1985, Celotex and a number of its liability insurers entered into the Agreement Concerning Asbestos-Related Claims (commonly known as the **"Wellington Agreement"**), which, among other things, resolved disputes concerning the manner in which liability insurance policies issued by the signatory insurers would respond to asbestos-related bodily injury claims against the signatory "producers" – companies like Celotex that had mined, manufactured, sold, and/or installed asbestos and/or asbestos-containing products. The Trust has pursued seven alternative dispute resolution ("**ADR**") proceedings under the Wellington Agreement in which the Trust seeks determinations that liability policies containing exclusions for "asbestosis" or "asbestosis and related diseases arising out of asbestos products" do not preclude coverage for diseases other than asbestosis, such as mesothelioma or lung cancer. The Trust has entered into agreements settling six of these ADR proceedings, which have been approved by the Bankruptcy Court, and has settled (with Bankruptcy Court approval) the seventh ADR proceeding with all but one insurer. The Trust hopes to resolve the remainder of this proceeding in 2007.

*Non-Products ADR Proceeding.* On May 25, 2000, the Trust filed an ADR proceeding against Travelers Casualty and Surety Company ("**Travelers**") and the London Market Insurers,

("**London**") asserting that the insurers must pay immediately for their share of Celotex's non-products liability. Under the Wellington Agreement, the Trust was obligated to mediate these disputes prior to taking any alternative action. The mediation was unsuccessful in resolving the parties' dispute, and the Trust formally initiated the trial phase of the ADR proceeding on October 29, 2001. Former federal district judge John Davies was selected as trial judge. In December 2003, the Trust entered into a settlement agreement with Travelers, which the Bankruptcy Court has approved. The Trust subsequently settled with certain of the London Market Insurers, and the Bankruptcy Court has approved those settlements as well. In September 2004, the Trust went to trial against the remaining London Market Insurers. In February 2005, the trial judge in this ADR proceeding issued a confidential ruling which has been appealed. In spring 2006 an appellate panel was chosen, and in fall 2006 the appellate panel affirmed. The Trust has entered into settlement agreements with additional London Market Insurers that are currently before the Bankruptcy Court for approval.

The Trust also demanded payment under policies issued to Celotex by Gibraltar Insurance Company. The Trust settled this dispute with Gibraltar in 2005, and the settlement has been approved by the Bankruptcy Court.

*Miscellaneous Other Proceedings.* On May 25, 2000, the Trust initiated an ADR proceeding against International Insurance Company and U.S. Fire Insurance Company, asserting that the insurers must pay immediately for Celotex's non-products and products liability. This dispute is in the mediation phase. The Trust has demanded payment pursuant to a coverage-in-place agreement with Hudson Insurance Company. That dispute is also in the mediation phase. In addition, Transit Insurance Company ("**Transit**") is an insolvent insurer that provides coverage to the Trust under four insurance policies. Because Transit is insolvent, it is not a party to the Adversary Proceeding. The Trust asserted a claim for coverage against Transit's receiver, and the parties reached a settlement in June 2001, which has been approved

by the Bankruptcy Court. In the 2002-2003 period, various other insurers, including certain subscribers to policies issued by the London Market, began insolvency proceedings. The Trust is currently pursuing coverage under these policies through the individual subscribers' insolvency procedures.

As described above, during the Reporting Period, there was substantial activity on behalf of the Trust involving insurance litigation proceedings. These efforts resulted in increased recoveries from insurers for the benefit of the Trust and also increased professional fees related to these efforts.

## B.  Supersedeas Bond Adversary Proceeding

The Trust has continued to  maintain an interest bearing reserve account related to the supersedeas bond litigation initiated during the Bankruptcy Cases by Celotex. This account was established by Celotex in accordance with this Court's May 29, 1992 order. The only claims against the supersedeas bond fund that remained unresolved at the beginning of the Reporting Period were the claims brought by Fibreboard Corporation ("**Fibreboard**").

Fibreboard's claims for contribution/equitable subrogation were denied by Final Judgment entered by this Court on February 10, 2003. Fibreboard appealed this adverse judgment. On November 30, 2005, the District Court affirmed the judgment in favor of Celotex. Fibreboard appealed this order to the Eleventh Circuit Court of Appeals. On December 20, 2006, the United States Court of Appeals for the Eleventh Circuit affirmed the District Court's order affirming the judgment in favor of Celotex. The mandate was issued on January 18, 2007 and the appeal is now final.

Pursuant to this Court's order entered on December 19, 2002, $3,364.232 remains in the interest bearing reserve account. The Trust will now seek the Court's authorization to close the interest bearing reserve account.

## VII.  THE FAIR ACT

During the Reporting Period, the United States Senate continued its review of a bill related to asbestos personal injury claims; the bill is called the Fairness in Asbestos Injury Resolution ("**FAIR Act**").  The legislation proceeded out of Committee and was considered by the full Senate in February of 2006, but was stalled when the Senate voted to sustain a budget point of order to block further consideration of the bill.  The Senate took no further action on this legislation during the last session of Congress, and no such legislation has been introduced in the current session.

As previously reported, on May 16, 2005 the Trust joined the Common Interest Group ("**CIG**") of asbestos trusts, making it the fifth member of this coalition of asbestos trusts that joined together to retain legal counsel to challenge the constitutionality of the FAIR Act and to preserve the ability of its member-trusts to continue to compensate the trusts' beneficiaries in accordance with their court-approved plans of reorganization. Other members included the NGC Trust, the Fuller-Austin Trust, the Western McArthur Trust, and the DII Industries, LLC Asbestos PI Trust.

After the last term of Congress ended with no action on asbestos legislation, the CIG wound down its activities.

Dated: Tampa, Florida    Respectfully submitted,
        May 1, 2007

                          KEATING MUETHING & KLEKAMP PLL
                          Kevin E. Irwin
                          One East Fourth Street
                          Suite 1400
                          Cincinnati, OH  45202
                          (513) 579-6400
                          (513) 579-6457 (telecopy)

                                    and

                          BUSH ROSS, P.A.
                          P.O. Box 3913
                          Tampa, FL 33601-3913
                          (813) 224-9255
                          (813) 223-9620 (telecopy)

                          *Attorneys for Celotex Asbestos Settlement Trust*


                          BY: /s/ Jeffrey W. Warren
                              Jeffrey W. Warren, Esq.
                              Florida Bar No. 150024

1998225.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 1, 2007, I electronically filed a true and correct copy of the Annual Report, Summary of Claims Disposed, Financial Statement and Account of the Trustees of the Asbestos Settlement Trust for the Period January 1, 2005 to December 31, 2005, including exhibits, with the Clerk of the United States Bankruptcy Court for the Middle District of Florida by using the CM/ECF system, and I furnished a copy of the foregoing document(s) to the following parties in the manner of service indicated below:

**Via United States Mail:**

**Legal Representative for Unknown Claimants**
James L. Patton Jr.
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

**Trust Advisory Committee**
Russell Budd
Baron & Budd
Suite 1100
3102 Oak Lawn Avenue
Dallas, TX 75219

Steven Kazan
Kazan, McClain, Edises, Simon & Abrams
Suite 300, 171 12th Street
Oakland, CA 94607

Gary W. Kendall
Michie Hamlett, Lowry, Rasmussen
 & Tweel, P.C.
Suite 300, 500 Court Square Building
P.O. Box 298
Charlottesville, VA 22902-0298

Joseph F. Rice
Motley Rice LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29465

*Counsel*
Elihu Inselbuch
Caplin & Drysdale, Chartered
35th Floor
375 Park Avenue
New York, NY 10152-3500

Trevor W. Swett, III
Caplin & Drysdale
1 Thomas Circle, NW
Suite 1100
Washington, DC 20005

**Property Damage Claims Administrator**
W. D. Hilton Jr.
Trust Services, Inc.
2716 Lee Street
Suite 500
Greenville, Texas 75401

*Counsel*
Scott L. Baena
Bilzin, Sumberg, Baena, Price & Axelrod LLP
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131-2336


**Property Damage Advisory Committee**
Karen Cordry
National Association of Attorneys General
Suite 1100
750 First Street N.E.
Washington, DC 20002

*Counsel*
John W. Kozyak
Kozyak, Tropin & Throckmorton, P.A.
2525 Ponce de Leon Boulevard
9th Floor
Coral Gables, FL 33134


Martin W. Dies
1009 West Green Avenue
Orange, TX 77630


Daniel A. Speights
Speights & Runyan
200 Jackson Avenue East
Hampton, South Carolina 29924


**Representative Indirect Asbestos Claimant**
Patrick M. Hanlon
Goodwin Proctor
901 New York Avenue, NW
Washington, DC 20001

*Counsel*
Roberta A. Colton
Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis
2700 Bank of America Plaza
101 East Kennedy Boulevard
Post Office Box 1102
Tampa, Florida 33601-1102


**Celotex Corporation**
George N. Wood
Celotex Corporation
10301 Dr. Martin Luther King, Jr. Street North
St. Petersburg, FL 33716

**Via CM/ECF System:**

**United States Trustee**
Sara Kistler
Assistant U.S. Trustee
501 East Polk Street, Suite 1200
Tampa, FL 33602

/s/ Jeffrey W. Warren         
Jeffrey W. Warren

1998225.1

EXHIBIT "1"

**AUDITED SPECIAL-PURPOSE
FINANCIAL STATEMENTS
WITH SUPPLEMENTAL INFORMATION**

# ASBESTOS SETTLEMENT TRUST

**DECEMBER 31, 2006 AND 2005 WITH
REPORT OF INDEPENDENT ACCOUNTANTS**

ASBESTOS SETTLEMENT TRUST

TABLE OF CONTENTS

DECEMBER 31, 2006 AND 2005

|  | Page |
|---|---|
| Report of Independent Accountants | 1-2 |
| Special-Purpose Financial Statements: | |
| Special-Purpose Statements of Assets, Liabilities and Net Assets Available for the Payment of Claims | 3 |
| Special-Purpose Statements of Changes in Net Assets Available for the Payment of Claims | 4 |
| Special-Purpose Statements of Cash Flows | 5 |
| Notes to the Special-Purpose Financial Statements | 6-14 |
| Supplemental Information: | |
| Report of Independent Accountants on Supplemental Information | 15 |
| Supplemental Schedules of Operating Expenses | 16-17 |
| Supplemental Schedules of Professionals Fees | 18-19 |
| Supplemental Schedule of Trustee Fees and Expenses | 20 |

**ARGY, WILTSE & ROBINSON, P.C.**
CERTIFIED PUBLIC ACCOUNTANTS & BUSINESS CONSULTANTS

LEADING BY EXAMPLE

## REPORT OF INDEPENDENT ACCOUNTANTS

March 28, 2007

To the Board of Trustees of the
      Asbestos Settlement Trust:

We have audited the accompanying special-purpose statement of assets, liabilities and net assets available for the payment of claims of the Asbestos Settlement Trust (the Trust) (a Trust created under the laws of the State of Florida), as of December 31, 2006 and the related special-purpose statement of changes in net assets available for the payment of claims and special-purpose statement of cash flows for the year then ended. These special-financial statements are the responsibility of the Trust's management. Our responsibility is to express an opinion on these special-purpose financial statements based on our audit. The special purpose financial statements of the Asbestos Settlement Trust for the year ended December 31, 2005 were audited by other auditors whose report dated April 25, 2006 expressed an unqualified opinion on those statements.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the special-purpose financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the special-purpose financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

As described in Note 2 to the special-purpose financial statements, these special-purpose financial statements were prepared on a special-purpose basis of accounting and are not intended to be a presentation in conformity with accounting principles generally accepted in the United States of America. The special-purpose basis of accounting has been used in order to communicate the amount of net assets presently available for current and future claimants.

In our opinion, the 2006 special-purpose financial statements referred to above present fairly, in all material respects, the financial position of the Trust as of December 31, 2006 and the results of its operations and its cash flows for the year then ended in conformity with the special-purpose basis of accounting described in Note 2.

1

800 Fairway Drive   Suite 340   Deerfield Beach, Florida 33441   Phone: 954-312-4600   Fax: 954-596-4720   www.awr.com
8405 Greensboro Drive   7th Floor   Tysons Corner   McLean, Virginia 22102   Phone: 703-893-0600   Fax: 703-893-2766

This report is intended solely for the information and use of the management of the Trust, the Trustees, the beneficiaries of the Trust, and the United States Bankruptcy Court for the Middle District of Florida, Tampa Division, and is not intended to be and should not be used by anyone other than these specified parties.

*Angy, Wilton & Robinson, P.C.*

2

# ASBESTOS SETTLEMENT TRUST

## SPECIAL-PURPOSE STATEMENTS OF ASSETS, LIABILITIES AND NET ASSETS AVAILABLE FOR THE PAYMENT OF CLAIMS

### DECEMBER 31, 2006 AND 2005

|  | 2006 | 2005 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 6,155,106 | $ 7,725,525 |
| Cash in escrow | 27,351 | 58,210 |
| Investments | | |
| Short-term investments, at market value | 111,814,488 | 240,267,599 |
| Short-term investments in escrow, at market value | 29,190,700 | 25,793,499 |
| Equity investments, at market value | 216,611,243 | 134,184,654 |
| Investments in bonds, at market value | 450,187,035 | 416,864,460 |
| Investments in bonds in escrow, at market value | 35,355,058 | 36,480,000 |
| Investment in The Celotex Corp., at estimated fair value | 44,225,403 | 42,993,368 |
| Interest and other receivables | 8,376,737 | 7,269,596 |
| Interest and other receivables on escrow assets | 351,316 | 464,305 |
| Due from related parties | 208,653 | 0 |
| Other assets | 340,225 | 0 |
| Federal tax refund due | 0 | 5,010,466 |
| Total assets | 902,843,315 | 917,111,682 |
| **Liabilities** | | |
| Accrued expenses and accounts payable | 1,389,772 | 1,772,595 |
| Commitments under noncancelable operating leases | 0 | 5,146,574 |
| Reserve for PD escrow claims | 58,362,770 | 55,711,615 |
| Reserve for disputed PD claims | 45,556,523 | 43,568,311 |
| Final installments due under IRC claims | 90,254,941 | 103,885,659 |
| Other liabilities | 1,432,413 | 768,243 |
| Total liabilities | 196,996,419 | 210,852,997 |
| **Net assets available for payment of claims** | $ 705,846,896 | $ 706,258,685 |

The accompanying notes are an integral part of these special-purpose financial statements.

## ASBESTOS SETTLEMENT TRUST

## SPECIAL-PURPOSE STATEMENTS OF CHANGES IN
## NET ASSETS AVAILABLE FOR THE PAYMENT OF CLAIMS

### YEARS ENDED DECEMBER 31, 2006 AND 2005

|  | 2006 | 2005 |
|---|---|---|
| **Additions** | | |
| Insurance recoveries | $ 63,828,432 | $ 129,209,631 |
| Interest and dividend income, net of amortization | 32,061,592 | 24,797,005 |
| Net appreciation (depreciation) in fair value of investments | 19,877,151 | (2,552,068) |
| Realized gain on investment in The Celotex Corp. | 1,232,035 | 3,416,718 |
| Other additions | 1,995,433 | 150,000 |
| Total additions | 118,994,643 | 155,021,286 |
| **Deductions** | | |
| Personal injury claim payments and expenses | 98,942,480 | 108,960,469 |
| Property damage claim payments and expenses | 4,860,548 | 4,767,952 |
| Operating expenses | 16,030,186 | 20,582,412 |
| Federal income tax benefit | (426,782) | (5,010,466) |
| Total deductions | 119,406,432 | 129,300,367 |
| (Decrease) increase in net assets available for the payment of claims | (411,789) | 25,720,919 |
| **Net assets available for the payment of claims** | | |
| Beginning of year | 706,258,685 | 680,537,766 |
| End of year | $ 705,846,896 | $ 706,258,685 |

The accompanying notes are an integral part of these special-purpose financial statements.

4

# ASBESTOS SETTLEMENT TRUST

## SPECIAL-PURPOSE STATEMENTS OF CASH FLOWS

### YEARS ENDED DECEMBER 31, 2006 AND 2005

|  | 2006 | 2005 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| (Decrease) increase in net assets available for the payment of claims | $ (411,789) | $ 25,720,919 |
| Adjustments to reconcile (decrease) increase in net assets available for the payment of claims to net cash (used in) provided by operating activities: | | |
| Accretion of discount on investments, net | 3,546,663 | 5,993,653 |
| Net change in net appreciation in fair value of investments | (19,877,151) | 2,552,068 |
| Realized gain on investment in The Celotex Corp. | (1,232,035) | (3,416,718) |
| Changes in operating assets and liabilities | | |
| Interest and other receivables | (994,152) | (1,489,221) |
| Due from related parties | (208,653) | 0 |
| Other assets | (340,225) | 0 |
| Federal tax refund due | 5,010,466 | (3,303,529) |
| Accrued expenses and accounts payable | (382,823) | (1,569,085) |
| Commitments under noncancelable operating leases | (5,146,574) | (253,500) |
| Reserve for PD escrow claims | 2,651,155 | 3,580,856 |
| PD claim settlements in course of payment | 0 | (8,000,000) |
| Reserve for disputed PD claims | 1,988,212 | 1,097,809 |
| Final installments due under IRC claims | (13,630,718) | 1,903,522 |
| Final installments due under PD claims | 0 | (126,386) |
| Net transfer from (to) cash in escrow | 30,859 | (31,231) |
| Other liabilities | 664,170 | 768,243 |
| Net cash (used in) provided by operating activities | (28,332,595) | 23,427,400 |
| **Cash flows from investing activities:** | | |
| Sales and maturities of bonds | 482,834,694 | 625,590,065 |
| Purchases of bonds | (452,798,646) | (653,901,633) |
| Purchases of equity securities | (95,131,641) | (48,578,083) |
| Sales of equity securities | 91,857,769 | 42,899,848 |
| Net cash used in investing activities | 26,762,176 | (33,989,803) |
| Net decrease in cash and cash equivalents | (1,570,419) | (10,562,403) |
| Cash and cash equivalents at the beginning of the year | 7,725,525 | 18,287,928 |
| Cash and cash equivalents at the end of the year | $ 6,155,106 | $ 7,725,525 |

The accompanying notes are an integral part of these special-purpose financial statements.

5

## NOTE 1 - DESCRIPTION OF THE TRUST

On October 12, 1990, The Celotex Corporation (Celotex Corp.) and its then wholly-owned subsidiary, Carey Canada Inc. (Carey Canada) (collectively, the Pre-Reorganized Companies), voluntarily filed petitions for reorganizing under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (the Bankruptcy Court). The filing of the petitions was precipitated by the Pre-Organized Companies' then potentially substantial present and future asbestos-related liabilities. On December 6, 1996, the Bankruptcy Court entered an order (the Confirmation Order) confirming the modified joint plan of reorganization (the Confirmed Plan) proposed and filed by the Pre-Reorganized Companies, the Asbestos Health Claimants Committee, the Legal Representative representing the interests of future asbestos bodily injury claimants, and the Trade Creditors Committee, and supported by the Asbestos Property Damage Claimants Committee. On March 4, 1997, the United States District Court for the Middle District of Florida adopted, issued and affirmed the Confirmation Order. The Confirmation Order has become final and cannot be appealed. The Confirmed Plan became effective on May 30, 1997 (the Effective Date or the Effective Date of the Plan of Reorganization).

The essential elements of the Confirmed Plan include, among other things: the utilization of a qualified settlement fund, in the form of the *Asbestos Settlement Trust* (the Trust), to assume all liabilities and obligations of the Pre-Reorganized Companies, in respect of all asbestos-related personal injury and property damage claims, both present and future (collectively, the Asbestos Claims), and to resolve, and provide for the payment in part or in full, of all Asbestos Claims in accordance with procedures established pursuant to the Confirmed Plan.

When formed, the Trust was funded with (a) cash received from Carey Canada, a wholly-owned subsidiary of Celotex Corp., (b) asbestos insurance recoveries as described in Note 2, (c) cash and investments from the Settlement Account, a segregated, custodial account at Bank of America Illinois, funded by Celotex Corp. and designated by order of the Bankruptcy Court dated March 30, 1995 as the Celotex Fund Recipient (as defined in the Veil Piercing Settlement Agreement), (d) 100% of the outstanding shares of reorganized Carey Canada common stock, (e) 100% of the outstanding shares of reorganized Celotex Corp. common stock, (f) promissory notes receivable from Celotex Corp., and (g) the Russellville Industrial Revenue Bond, contributed by JWC Holdings Corporation (JWC), the former parent of Celotex Corp., in consideration for the releases and injunctions described in the Confirmed Plan.

The Trustees are responsible for supervising and administering the Asbestos Claims resolution process. The Trust will use its funding for Trust operations and for settlement of Asbestos Claims as defined in the Confirmed Plan.

6

## NOTE 2 - SIGNIFICANT ACCOUNTING POLICIES

### Basis of presentation

The Trust's financial statements are prepared using special-purpose accounting methods adopted by the Trustees which differ from accounting principles generally accepted in the United States of America (GAAP). The special-purpose accounting methods were adopted in order to communicate to the beneficiaries of the Trust the net assets available for the payment of claims and the related operating expenses of the Trust. Since the accompanying financial statements and transactions are not based upon GAAP, accounting treatment by other parties for these same transactions may differ as to timing and amount. Certain prior year amounts have been reclassified to conform with the current year presentation. The special-purpose accounting methods include the following:

- Assets are recorded as they are received by the Trust and are available for the payment of asbestos claims.

- Future fixed liabilities under contractual obligations and other agreements entered into by the Trust are recorded as deductions in the same period that such contractual obligations or agreements are signed. Accordingly, the future minimum lease payments under noncancelable operating leases have been recorded as a deduction from net assets available for the payment of claims. Under GAAP, liabilities and contractual obligations are recorded over the period that is benefited by the contract or agreement.

- The full amount of claims is expensed in the period in which the confirmed claims are settled. Final installments due on Individually-Reviewed Claims (IRC) and Property Damage Claims (PD) represent a reserve established to record the liability for payments on settled IRC and PD Claims. One-half of the payment is made upon settlement and the second payment is expensed and the reserve established. The second payment is made two years after the first payment. The reserve for disputed PD claims was established, at the direction of the Bankruptcy Court, for claims submitted to the Trust for payment by the Property Damage Claims Facility (PDCF) as to which the Trust had withheld payment based on its determination that the claims should not be paid. The reserve for PD escrow claims was established pursuant to a court order to segregate funds for claims submitted to the Trust for payment by the PDCF as to which the Trust has appealed orders of the Bankruptcy Court determining that the claims should be paid. No other types of claims are accrued, since the Trust pays all other types of claims shortly after they are confirmed by the Trust and accepted by the claimant. Under GAAP, a liability would be recorded for an estimate of the amount to be paid for claims that have been incurred but not yet reported, and for those claims that have been submitted but not yet approved for payment by the Trust.

- Payments for services to be received over an extended period in the future are expensed as paid because these amounts are no longer available for the payment of claims. Under GAAP, an asset would be recorded and amortized over the period in which the related benefits are received.

7

- Payments for property and equipment are expensed as incurred. Under GAAP, payments for fixed assets are capitalized and depreciated over the useful lives of the assets. During 2006 and 2005, $2,078,392 and $888,053, respectively, were expensed related to purchases of property and equipment.

- The Trust's investment in 100% of the outstanding common stock of Celotex Corp. is being accounted for at estimated fair value. Any changes in the value of the Trust's investment in the Celotex Corp. is recorded as a realized gain or loss. Under GAAP, consolidated financial statements of the Trust and Celotex Corp. would be presented.

- Income tax expense is estimated and recorded as incurred in the period in which certain income and expense items affect current federal income taxes payable. Under GAAP, the provision for income taxes is recorded based upon income reported for financial statement purposes, and federal and state income taxes both currently payable and changes in deferred taxes due to differences between financial reporting and tax bases of assets and liabilities.

- The Trust does not record any asbestos insurance recoveries until the funds are received from the insurance carriers. These recoveries come from various insurance coverages obtained by Celotex Corp. covering, among other things, products and general liability claims. Future recoveries under such policies will inure to the Trust.

- The Trust records amortization of premium and accretion of discount on its investment securities under the straight-line method. Under GAAP, such amortization and accretion would be calculated under the effective interest (i.e., constant yield) method.

- Investments are recorded at market-value. All interest and dividend income, net of interest expenses, are included in interest and dividend income on the accompanying special-purpose statements of changes in net assets available for the payment of claims. The net appreciation in fair value of investments in the accompanying special-purpose statements of changes in net assets available for the payment of claims consists of realized gains or losses on sales of investments and unrealized gains or losses on investments held.

**Use of estimates**

The preparation of financial statements in conformity with the special-purpose accounting methods described above requires the Trust to make estimates and assumptions that affect the reported amounts of certain assets and liabilities and the disclosures of contingent assets and liabilities at the date of the financial statements, as well as the reported amounts of additions and deductions to the net assets available for the payment of claims during the reporting period. Actual results could differ from those estimates and would have an effect upon the net assets available for the payment of claims.

**Cash equivalents**

The Trust considers all highly liquid instruments with original maturities of one month or less to be cash equivalents. At December 31, 2006, the Trust maintained a bank account which held funds in excess of FDIC-insured limits.

**Short-term investments**

Short-term investments include commercial paper and other liquid investments with original maturities of less than one year.

**Investments**

Investment securities stated at market value are based on quoted market prices as of the date of the special-purpose financial statements with the changes in unrealized gains and losses recorded in the current period. Investment income is recognized when earned. Gains and losses on sales are determined using the specific identification method.

**Cash, short-term investments, and bonds in escrow**

These assets in escrow include liquid instruments with the same financial characteristics as the respective investments not held in escrow, as described above. These funds are restricted in an escrow account, by court order, for the benefit of certain claims comprising the Reserve for PD escrow claims.

**Accrued expenses and accounts payable**

Accrued expenses and accounts payable consist of legal accruals, as well as outstanding invoices associated with managing the Trust.

**Reserve for Property Damage (PD) Escrow Claims**

In 2004, the Trust established a reserve for property damage claims that were segregated from the general assets of the Trust, by court order, through establishment of an escrow account. The restricted assets comprising the escrow account are partially offset by the corresponding reserve. At December 31, 2004, this escrow account included Property Damage claims from the City of New York, the State of Illinois, and Federal Lessors. The balance in the escrow account was established at 120% of the total allowed costs multiplied by the applicable payment percentage. The Reserve for PD Escrow Claims was $58,362,770 and $55,711,615 as of December 31, 2006 and 2005, respectively. The total assets in escrow, at December 31, 2006 and 2005, were $64,545,758 and $62,273,499, respectively.

**Reserve for Disputed Property Damage (PD) Claims (PDCF)**

The Trust has established reserves for a number of property damage claims. Property damage claims are triggered for payment after the Trust has received written notice of final determination and a request for payment. If after further review by the Trust, the Trust agrees with the determination of the PDCF, the claim will be processed for payment. Approved claims are paid at the total allowed costs multiplied by the applicable payment percentage.

The Reserve for Disputed PD Claims was established in 2002 as a contingent liability and was created at the direction of the Bankruptcy Court in connection with the pending litigation regarding the non-payment of unresolved disputed property damage claims for which the Trust has received a written notice of determination and a request for payment. The Trust has withheld payment of the disputed property damage claims based on its determination that the claims do not satisfy the legal prerequisites for payment by the Trust. These claims are reserved at the total allowed cost multiplied by the applicable payment percentage. Interest is added to the reserve

amount after the date the claim was sent to the Trust for payment. The interest component is calculated each quarter using the Trust's return on investment since the inception. The balance in the Reserve for Disputed PD Claims was $45,556,523 and $43,568,311 as of December 31, 2006 and 2005, respectively.

**Services income**

During the year ended December 31, 2006, the Trust entered into services agreements with several other unrelated qualified settlement trusts, and recorded income of $2,653,234 related to these services. Effective January 1, 2007, the Trust no longer provides such services (see Note 3).

**Operating and administrative expenses**

Operating and administrative expenses of the Trust are paid from net assets available for the payment of claims when invoices are received.

## NOTE 3 - RELATED PARTIES

On November 1, 2006, the Trust became a member in a limited liability company under an agreement with four other Qualified Settlement funds, contributing property and equipment valued at $132,193 as a capital contribution to this entity.

Effective January 1, 2007, this entity began processing all of the Trust's bodily injury claims.

During the year ended December 31, 2006, the Company paid expenses related to the operations of this entity of $208,653. As of December 31, 2006, $208,653 is due to the Trust from this entity related to such costs.

## NOTE 4 - INVESTMENTS

Investment securities consist of the following at December 31, 2006:

|  | Amortized Cost | Unrealized Gains | Unrealized Losses | Market Value |
|---|---|---|---|---|
| Short-term bonds | $ 111,810,966 | $ 28,811 | $ (25,289) | $ 111,814,488 |
| Short-term bonds in escrow | 29,196,995 | - | (6,295) | 29,190,700 |
| Equity | 189,461,163 | 54,332,017 | (27,181,937) | 216,611,243 |
| Bonds | 448,696,245 | 9,790,294 | (8,299,505) | 450,187,034 |
| Bonds in escrow | 35,355,058 | - | - | 35,355,058 |
|  | $ 814,520,427 | $ 64,151,122 | $ (35,513,026) | $ 843,158,523 |

Investment securities consist of the following at December 31, 2005:

|  | Amortized Cost | Unrealized Gains | Unrealized Losses | Market Value |
|---|---|---|---|---|
| Short-term bonds | $240,476,599 | $ 11,770 | $ (220,770) | $240,267,599 |
| Short-term bonds in escrow | 25,829,615 | - | (36,116) | 25,793,499 |
| Equity | 119,199,688 | 18,594,828 | (3,609,862) | 134,184,654 |
| Bonds | 415,594,938 | 3,391,528 | (2,122,006) | 416,864,460 |
| Bonds in escrow | 36,480,000 | - | - | 36,480,000 |
|  | $837,580,840 | $21,998,126 | $ (5,988,754) | $853,590,212 |

**Investment in the Celotex Corporation**

The Celotex Corp. common stock investment represents a 100% ownership interest in Celotex Corp. The estimated fair value of the Trust's investment in the common stock of The Celotex Corp. as of December 31, 2006 and 2005 consisted of cash and cash equivalents, marketable securities and the fair value of remaining real estate.

The Trust realized a gain on its investment in Celotex Corp. of $1,232,035 and $3,416,718 for the years ended December 31, 2006 and 2005, respectively, for the change in the estimated fair value of its investment.

**NOTE 5 - INCOME TAXES**

The Trust is classified as a Qualified Settlement Fund pursuant to the Internal Revenue Code and Regulations (the Code) thereunder. As a result, the Trust is subject to federal income taxes based on modified gross income, as defined by the Code. In the opinion of management, the Trust is not subject to state income taxes and therefore, the special-purpose financial statements do not include any provision or liability for state income taxes.

The income tax benefit for the years ended December 31, 2006 and 2005 was $426,782 and $5,010,466, respectively.

As of December 31, 2006, the Trust had available a net operating loss carryforward of $44,183,427 to offset future taxable income and net capital loss carryforward of $48,172,600 to offset future capital gain income. In accordance with the Trust's accounting policies, no asset has been recorded for such carryforwards; the benefit of such carryforwards is recorded by the Trust when realized as a current tax benefit. The Trust's carryforwards will expire, if not utilized, in various years through 2025.

**NOTE 6 - CONTINGENT ASSETS AND INSURANCE RECOVERIES**

In accordance with the special-purpose accounting methods adopted by the Trust, the following contingent assets will be recorded when, and if, they become available for the payment of claims.

The Confirmed Plan had provided for the transfer to the Trust of a remainder interest in a Bond Reserve Account once the primary obligations related to those assets have been satisfied. The balance of the Bond Reserve Account at December 31, 2006 and 2005 was $3,364,232 and $3,207,358, respectively.

The Trust received insurance recoveries from insurers in the amount of $63,828,432 and $129,209,631 during the years ended December 31, 2006 and 2005, respectively. Under the terms of settlement agreements with certain insurance companies, the Trust is entitled to future insurances recoveries that are to be paid ratably over an extended period of time. In accordance with the Trust's accounting policies, such insurance recoveries are recorded as an addition to net assets available for the payment of claims when the funds are received from the insurance companies.

## NOTE 7 - COMMITMENTS AND CONTINGENT LIABILITIES

### Leases

As discussed in Note 3, effective January 1, 2007 the Company began using a related party to process its claims. As a result, the Company terminated its office space lease, and thus, reversed the lease commitment associated with that lease. This resulted in an addition to net assets available for the payment of claims of $4,677,196 during the year ended December 31, 2006. The Company has no other lease commitment as of December 31, 2006.

### Other contingencies

The Trust has entered certain reimbursement and indemnification agreements in the Plan Documents (as defined in the Confirmed Plan), including, but not limited to, Agreement Regarding Disputed Claims, Affiliate Asset Purchase Agreements, and the Tax Cooperation and Indemnification Agreements. These agreements could result in future claims against the Trust.

The probability of such claims cannot be reasonably determined. Accordingly, no associated liability has been recorded in the accompanying special-purpose financial statements. Such claims, if any, are not expected to be material.

Substantial third party claims have been asserted against Celotex Corp. for which the Trust may be contingently liable. It is presently not possible to determine the extent, if any, of the Celotex Corp's liability which might arise as a result thereof.

## NOTE 8 - LIABILITY FOR ASBESTOS CLAIMS

The ultimate number of Asbestos Claims to be filed and the liability for all such claims is not determinable at this time. Net assets available for the payment of claims at December 31, 2006 and 2005 represents funding available for all Asbestos Claims for which no fixed liability has yet been established. Net assets available for the payment of claims at December 31, 2006 may or may not be sufficient to meet all future obligations of the Trust.

## NOTE 9 - TRUSTEES' LIABILITY INSURANCE

The Trust purchased Trustees' liability insurance for a premium of $390,000 and $355,000 in 2006 and 2005, respectively. The current policy term is May 30, 2006 to May 30, 2007. The Trust's accounting policy is to expense in the current period any amounts which will not be available to pay future Asbestos Claims or expenses of the Trust. Accordingly, an amount of $384,830 and $355,000 was recorded as a deduction in net assets available for payments of claims in 2006 and 2005, respectively.

## NOTE 10 - TRUSTEES AND TRUST ADVISORS

The individuals serving as Trustees of the Trust are not voting members of the Board of Directors of Celotex Corp. The Trustees are required to provide notice, to consult, or obtain the consent of the Trustees' Advisory Committee (the TAC), the Legal Representative, the Property Damage Advisory Committee (the PDAC) or the Property Damage Claims Administrator (the PDCA) in various matters as detailed in the First Amended and Restated Asbestos Settlement Trust Agreement, the Asbestos Settlement Trust First Amended and Restated Bylaws, the Second Amended and Restated Asbestos Personal Injury Claims Resolution Procedures and the Third Amended and Restated Asbestos Property Damage Claims Resolution Procedures.

Fees and expenses of the Trustees and trust advisors for 2006 and 2005 were:

| | 2006 | | |
|---|---|---|---|
| | Fees | Expenses | Total |
| Trustees | $ 278,880 | $ 12,362 | $ 291,242 |
| Trustees' Advisory Committee | 167,840 | 5,501 | 173,341 |
| Legal representative | 107,739 | 10,493 | 118,232 |
| Property Damage Advisory Committee | 127,158 | 11,006 | 138,164 |
| Property Damage Claims Administrator | 0 | 3,113,193 | 3,113,193 |
| | $ 681,617 | $ 3,152,555 | $ 3,834,172 |

| | 2005 | | |
|---|---|---|---|
| | Fees | Expenses | Total |
| Trustees | $ 279,903 | $ 18,990 | $ 298,893 |
| Trustees' Advisory Committee | 431,095 | 15,325 | 446,420 |
| Legal representative | 188,705 | 20,428 | 209,133 |
| Property Damage Advisory Committee | 491,585 | 32,117 | 523,702 |
| Property Damage Claims Administrator | 108,000 | 1,543 | 109,543 |
| | $ 1,499,288 | $ 88,403 | $ 1,587,691 |

The above amounts are included in operating expenses in the special-purpose financial statements of changes in net assets available for the payment of claims for the years ended December 31, 2006 and 2005.

13

**SUPPLEMENTAL INFORMATION**



**ARGY, WILTSE & ROBINSON, P.C.**
CERTIFIED PUBLIC ACCOUNTANTS & BUSINESS CONSULTANTS

LEADING BY EXAMPLE

## REPORT OF INDEPENDENT ACCOUNTANTS
## ON SUPPLEMENTAL INFORMATION

March 28, 2007

To the Board of Trustees of the
    Asbestos Settlement Trust:

Our audit was made for the purpose of forming an opinion on the basic special-purpose financial statements for the year ended December 31, 2006 taken as a whole in accordance with the basis of accounting described in Note 2 of such statements. The supplemental information on pages 16 to 20 is presented for purposes of additional analysis and is not a required part of the basic special-purpose financial statements. The supplemental information for the year ended December 31, 2006 has been subjected to the auditing procedures applied in the audit of the basic special-purpose financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic special-purpose financial statements taken as a whole. The supplemental information for the year ended December 31, 2005 was audited by other auditors whose report, dated April 25, 2006, expressed an unqualified opinion on such information in relation to the basic special-purpose financial statements taken as a whole.

*Argy, Wiltse & Robinson, P.C.*

MEMBER OF THE LEADING EDGE ALLIANCE

800 Fairway Drive  Suite 340  Deerfield Beach, Florida 33441  Phone: 954-312-4600  Fax: 954-596-4720  www.awr.com
8405 Greensboro Drive  7th Floor  Tysons Corner  McLean, Virginia 22102  Phone: 703-893-0600  Fax: 703-893-2766

# ASBESTOS SETTLEMENT TRUST

## SUPPLEMENTAL SCHEDULE OF OPERATING EXPENSES

### YEAR ENDED DECEMBER 31, 2006

| | | | |
|---|---:|---:|---:|
| Professional fees (see Supplemental Schedule of Professional Fees) | | $ | 5,739,676 |
| General and administrative | | | |
| Bank service fees - Brown Brothers | $ 7,500 | | |
| Investment advisory fees - Brown Brothers | 724,340 | | |
| Investment advisory fees - Cambridge & Associates | 213,911 | | |
| Investment advisory fees - Goldman Sachs | 265,982 | | |
| Investment advisory fees - Grantham, Mayo & Otterloo | 255,671 | | |
| Investment advisory fees - John W. Bristol | 188,468 | | |
| Investment advisory fees - McDonald Capital | 196,739 | | |
| Investment advisory fees - Sanderson | 283,819 | | |
| Other Administrative Expenses | 9,398 | | |
| | | | 2,145,828 |
| Trustee fees and expenses | | | 291,242 |
| TAC fees and expenses | | | |
| Caplin & Drysdale/fees | 167,840 | | |
| Caplin & Drysdale/expenses | 4,561 | | |
| Kazan, McClain, Abrams, Fernandez/expenses | 940 | | |
| | | | 173,341 |
| Legal representative fees and expenses | | | |
| Young, Conaway, Stargatt & Taylor/fees | 107,739 | | |
| Young, Conaway, Stargatt & Taylor/expenses | 10,493 | | |
| | | | 118,232 |
| Property Damage Advisory Committee fees and expenses | | | |
| Kozyak, Tropin & Throckmorton/attorney fees | 127,158 | | |
| Kozyak, Tropin & Throckmorton/expenses | 11,006 | | |
| | | | 138,164 |
| Property Damage Claims Administrator fees and expenses | | | |
| Collins-Hilton, Inc./expenses | 900,000 | | |
| Hilton W.D., Jr./expenses | 2,100,000 | | |
| Trust Services, Inc. | 113,193 | | |
| | | | 3,113,193 |
| Carey-Canada fees and expenses | | | |
| Administrative expenses | 25,980 | | |
| U.S. trustee fees | 11,000 | | |
| | | | 36,980 |
| Trustee liability insurance | | | 384,830 |
| United States trustee fee | | | 30,000 |
| Wilmington operating expenses | | | 3,858,700 |
| Total operating expenses | | $ | 16,030,186 |

**SUPPLEMENTAL SCHEDULE OF OPERATING EXPENSES**

**YEAR ENDED DECEMBER 31, 2005**

| | | | |
|---|---|---:|---:|
| Professional fees (see Supplemental Schedule of Professional Fees) | | | $ 9,321,904 |
| | | | |
| General and administrative | | | |
| Bank service fees - First Union | $ | 10,250 | |
| Investment advisory fees - Brown Brothers | | 757,047 | |
| Investment advisory fees - Cambridge & Associates | | 206,278 | |
| Investment advisory fees - Goldman Sachs | | 260,698 | |
| Investment advisory fees - Grantham, Mayo & Otterloo | | 243,076 | |
| Investment advisory fees - John W. Bristol | | 177,114 | |
| Investment advisory fees - McDonald Capital | | 182,115 | |
| Letter of credit commission | | 13,505 | |
| Other Administrative Expenses | | 9,726 | |
| | | | 1,859,809 |
| | | | |
| Trustee fees and expenses | | | 298,893 |
| | | | |
| TAC fees and expenses | | | |
| Caplin & Drysdale/fees | | 431,095 | |
| Caplin & Drysdale/expenses | | 12,033 | |
| Michie, Hamlett/expenses | | 3,292 | |
| | | | 446,420 |
| | | | |
| Legal representative fees and expenses | | | |
| Young, Conaway, Stargatt & Taylor/fees | | 172,055 | |
| Shrager, Spivey/fees | | 16,650 | |
| Young, Conaway, Stargatt & Taylor/expenses | | 20,210 | |
| Shrager, Spivey/expenses | | 218 | |
| | | | 209,133 |
| | | | |
| Property Damage Advisory Committee fees and expenses | | | |
| Kozyak, Tropin & Throckmorton/attorney fees | | 490,085 | |
| National Association of Attorneys General/fees | | 1,500 | |
| Kozyak, Tropin & Throckmorton/expenses | | 32,090 | |
| National Association of Attorneys General/expenses | | 27 | |
| | | | 523,702 |
| | | | |
| Property Damage Claims Administrator fees and expenses | | | |
| Collins-Hilton, Inc./fees | | 108,000 | |
| Collins-Hilton, Inc./expenses | | 1,543 | |
| | | | 109,543 |
| | | | |
| Carey-Canada fees and expenses | | | |
| Administrative expenses | | 29,791 | |
| U.S. trustee fees | | 1,000 | |
| | | | 30,791 |
| | | | |
| Celotex Corporation - administrative expense reimbursement | | | 149,954 |
| Trustee liability insurance | | | 355,000 |
| United States trustee fee | | | 40,000 |
| Federal tax | | 65,475 | |
| State tax (North Carolina) | | 29,996 | |
| | | | 95,471 |
| Wilmington operating expenses | | | 7,141,792 |
| | | | |
| Total operating expenses | | | $ 20,582,412 |

See report of independent accountants on supplemental information.

# ASBESTOS SETTLEMENT TRUST

## SUPPLEMENTAL SCHEDULE OF PROFESSIONAL FEES

### YEAR ENDED DECEMBER 31, 2006

| | | |
|---|---:|---:|
| Accounting | | |
| Accounting/audit | $ | 165,905 |
| Accounting/taxes | | 16,260 |
| Subtotal accounting | | 182,165 |
| Legal fees | | |
| Insurance issues | | |
| Bush, Ross, Gardner, Warren & Rudy, P.A. | | 17,686 |
| Clint Fisher, Esq. | | 66,763 |
| Farrell Fritz PC | | 34,587 |
| Gilbert, Heintz & Randolph, LLP | | 471,504 |
| Keating, Muething & Klekamp | | 102,590 |
| KCIC, LLC | | 104,855 |
| Navigant Consulting, Inc. | | 7,342 |
| Schropp, Buell & Elligett | | 3,879 |
| Superior Group | | 8,725 |
| William H. Webster | | 9,036 |
| Other | | 65,767 |
| Subtotal insurance | | 892,734 |
| Property damage | | |
| Bush, Ross, Gardner, Warren & Rudy, P.A. | | 310,131 |
| Keating, Muething & Klekamp | | 7,822 |
| Montgomery, McCracken, Walker & Rhoads, LP | | 246,002 |
| Subtotal property damage | | 563,955 |
| FAIR Act | | |
| Cooper & Kirk | | 1,225,519 |
| Keating, Muething & Klekamp | | 20,900 |
| Other | | 4,223 |
| Subtotal FAIR Act | | 1,250,642 |
| General | | |
| Ann Soden | | 32,815 |
| Borden, Ladner | | 153,717 |
| Bush, Ross, Gardner, Warren & Rudy, P.A. | | 116,099 |
| Gilbert, Heintz & Randolph, LLP | | 74,478 |
| Keating, Muething & Klekamp | | 1,181,635 |
| Montgomery, McCracken, Walker & Rhoads, LP | | 3,597 |
| Other | | 18,975 |
| Subtotal general | | 1,581,316 |
| Other professional fees (general) | | |
| ARPC | | 660,486 |
| Other | | 1,527 |
| Subtotal other professional fees (general) | | 662,013 |
| Other professional fees (FAIR Act) | | |
| Public Strategies, Inc. | | 103,339 |
| The Nickles Group | | 43,036 |
| Zuckerman Spaeder | | 15,768 |
| Other | | 444,708 |
| Subtotal other professional fees (FAIR Act) | | 606,851 |
| Total professional fees | $ | 5,739,676 |

See report of independent accountants on supplemental information.

18

# ASBESTOS SETTLEMENT TRUST

## SUPPLEMENTAL SCHEDULE OF PROFESSIONAL FEES

## YEAR ENDED DECEMBER 31, 2005

| | | |
|---|---|---:|
| Accounting | | |
| Accounting/audit | $ | 116,508 |
| Accounting/taxes | | 23,445 |
| Subtotal accounting | | 139,953 |
| Legal fees | | |
| Insurance issues | | |
| ARPC | | 29,816 |
| Bush, Ross, Gardner, Warren & Rudy, P.A. | | 17,980 |
| Clint Fisher, Esq. | | 28,955 |
| Dickstein Shapiro | | 1,787,001 |
| Gilbert, Heintz & Randolph, LLP | | 2,881,550 |
| JAMS | | 13,121 |
| Keating, Muething & Klekamp | | 156,640 |
| Kenesis Group, LLC | | 165,747 |
| Navigant Consulting, Inc. | | 24,811 |
| Reliable Copy Serve | | 36,399 |
| Special Counsel | | 10,679 |
| Superior Group | | 12,664 |
| Other | | 3,017 |
| Subtotal insurance | | 5,168,380 |
| Property damage | | |
| Bush, Ross, Gardner, Warren & Rudy, P.A. | | 1,392,495 |
| Keating, Muething & Klekamp | | 90,534 |
| Montgomery, McCracken, Walker & Rhoads, LP | | 245,668 |
| Subtotal property damage | | 1,728,697 |
| FAIR Act | | |
| Cooper & Kirk | | 59,280 |
| Gibson Dunn | | 163,443 |
| Keating, Muething & Klekamp | | 135,800 |
| Other | | 6,301 |
| Subtotal FAIR Act | | 364,824 |
| General | | |
| Ann Soden | | 44,714 |
| Borden, Ladner | | 123,317 |
| Bush, Ross, Gardner, Warren & Rudy, P.A. | | 45,297 |
| Gilbert, Heintz & Randolph, LLP | | 10,754 |
| Keating, Muething & Klekamp | | 970,532 |
| Morris, Nichos, Arsht & Tunnell | | 8,312 |
| Other | | 1,770 |
| Subtotal general | | 1,204,696 |
| Other professional fees (general) | | |
| ARPC | | 601,589 |
| Subtotal other professional fees (general) | | 601,589 |
| Other professional fees (FAIR Act) | | |
| ARPC | | 24,504 |
| Public Strategies, Inc. | | 44,300 |
| The Nickles Group | | 21,000 |
| Zuckerman Spaeder | | 23,961 |
| Subtotal other professional fees (FAIR Act) | | 113,765 |
| Total professional fees | $ | 9,321,904 |

# ASBESTOS SETTLEMENT TRUST

## SUPPLEMENTAL SCHEDULE OF TRUSTEE FEES AND EXPENSES

### YEARS ENDED DECEMBER 31, 2006 AND 2005

| | 2006 Trustee Fees and Expenses Paid in 2006 | | | |
|---|---|---|---|---|
| | Per Annum | Per Diem | Out-of Pocket Expenses | Total Payments |
| Frank Andrews | $ 60,000 | $ 30,840 | $ 6,229 | $ 97,069 |
| Sharon Meadows | 60,000 | 26,685 | 1,308 | 87,993 |
| James Stevens | 60,000 | 16,730 | 1,166 | 77,896 |
| | $ 180,000 | $ 74,255 | $ 8,703 | $ 262,958 |

| | 2006 Trustee Fees and Expenses Accrued and Unpaid in December 31, 2006 | | | |
|---|---|---|---|---|
| | Per Annum | Per Diem | Out-of Pocket Expenses | Total Expenses |
| Frank Andrews | $ 0 | $ 6,590 | $ 2,193 | $ 105,852 |
| Sharon Meadows | 0 | 12,435 | 609 | 101,037 |
| James Stevens | 0 | 5,600 | 857 | 84,353 |
| | $ 0 | $ 24,625 | $ 3,659 | $ 291,242 |

| | 2005 Trustee Fees and Expenses Paid in 2005 | | | |
|---|---|---|---|---|
| | Per Annum | Per Diem | Out-of Pocket Expenses | Total Payments |
| Frank Andrews | $ 55,000 | $ 36,860 | $ 14,552 | $ 106,412 |
| Sharon Meadows | 55,000 | 33,263 | 2,091 | 90,354 |
| James Stevens | 55,000 | 21,950 | 1,281 | 78,231 |
| | $ 165,000 | $ 92,073 | $ 17,924 | $ 274,997 |

| | 2005 Trustee Fees and Expenses Accrued and Unpaid in December 31, 2005 | | | |
|---|---|---|---|---|
| | Per Annum | Per Diem | Out-of Pocket Expenses | Total Expenses |
| Frank Andrews | $ 0 | $ 7,900 | $ 0 | $ 114,312 |
| Sharon Meadows | 0 | 9,845 | 619 | 100,818 |
| James Stevens | 0 | 5,085 | 447 | 83,763 |
| | $ 0 | $ 22,830 | $ 1,066 | $ 298,893 |

Trustee fees and expenses accrued and unpaid at December 31, 2006 and 2005 are included in accrued expenses and accounts payable in the special-purpose statements of assets, liabilities and net assets available for the payment of claims.

See report of independent accountants on supplemental information.

EXHIBIT "2"

# ASBESTOS SETTLEMENT TRUST

## INVESTMENT GUIDELINES FOR THE ASBESTOS SETTLEMENT TRUST

### March 2006 (Revised)

1. The asset allocation for the Trust portfolio is as follows:

| Asset Class | % of Portfolio |
|---|---|
| Short-Term Municipal Bonds | 30.0% |
| Total Return Municipal Bonds | 45.0% |
| U.S. Equity | 15.0% |
| Non-U.S. Equity | 10.0% |
| Total Portfolio | 100.0% |

   a. The short-term municipal bond allocation reflects the rolling 2-year liability of the Trust for the next several years.

   b. The total return municipal bond portfolio exists to provide intermediate-duration bonds given the length of the expected liability stream of the Trust. Given the current tax rate of the Trust, the portfolio will largely be invested in municipal bonds, but managers have the ability on an opportunistic basis to attain higher yield through taxable securities.

   c. The equity allocation exists to attain long-term capital appreciation, given the projected existence of the Trust. Historically, equities have outperformed bonds in attained long-term capital appreciation.

      i. The equity portfolio is structured to have exposure to both a growth and value style of investing to provide the necessary diversification in this portfolio.

      ii. In addition, the equity portfolio is broadly diversified across economic sectors and securities to provide additional diversification and reduce portfolio risk.

      iii. The equity portfolio is prohibited from holding any securities whose primary revenue derives from tobacco or tobacco-related products.

2. The portfolio will be monitored monthly by Cambridge Associates, and evaluated quarterly by the Investment Committee as to whether or not the portfolio requires rebalancing. Rebalancing decisions are contingent on cash flow needs and market values and conditions.

3. Individual investment managers are subject to their individual manager guidelines, with respect to investment objective, benchmark, allowable securities, credit quality requirements (if applicable), and concentration limits.

4. Investments for the Account shall be subject to the following restrictions as stated in the Trust Agreement:

   a. The Adviser shall not acquire for the Account equity in any entity or other business enterprise if, immediately following such acquisition, the Account would hold more than 5% of the equity in such entity or business enterprise. The Account shall not hold, directly or indirectly, more than 10% of the equity in any entity or business enterprise.

b. The Account shall not acquire or hold any long-term debt securities unless such securities are rated "Baa category" or higher by Moody's, "BBB category" or higher by S&P or have been given an equivalent investment grade rating by another nationally recognized statistical rating service, or have been issued or fully guaranteed as to principal and interest by the United States or any agency thereof.

c. The Account shall not acquire or hold for longer than 90 days any commercial paper unless such paper is rated "Prime-1" or higher by Moody's or "A-1" or higher by S&P or has been given an equivalent rating by another nationally recognized statistical rating agency.

d. The Account shall not acquire or hold any preferred stock unless such preferred stock is rated "AA category" or higher by Moody's or "A category" or higher by S&P or has been given an equivalent rating by another nationally recognized statistical rating agency.

e. The Account shall not acquire or hold any certificates of deposit unless all publicly held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Item 2 above.

f. The Account shall not acquire or hold any repurchase obligations unless, in the opinion of the Adviser, they are adequately collateralized.

g. The Account shall not acquire or hold any options.

h. The Account shall not acquire or hold emerging market debt.

i. The following is not permitted: leverage (excludes futures transactions as defined above), reverse repurchase agreements; short-selling (except with respect to shorts against the box, and futures).

j. Trading with affiliated broker/dealers is not permitted.

k. Client has the right to advise Adviser at any time of any further restrictions applicable to the investments of and for the Account, and Adviser will thereafter abide by such restrictions in the management of the Account upon written notification by the Client to the Adviser.

5. The Manager will report the following information each month to the Trustees and to Cambridge Associates, Inc.: total return net of all commissions and fees; additions to, and withdrawls from, the Portfolio; current holdings at cost and market; and purchases and sales for the quarter. On an annual basis, the Manager will provide the Trustees with an audited and certified financial statement of the Manager's firm.

6. The Manager is required to inform the Trustees of any material change in fundamental investment philosophy or investment process, ownership, organizational structure, professional personnel, or Portfolio structure.

EXHIBIT "3"

Celotex Asbestos Settlement Trust
Summary of Claims Disposed - 2006
Personal Injury and Property Damage

| Month | DCP Paid Claims 2006 Amount | # of Claims | IRC Second Payments Paid in 2006 Amount | # of Claims | IRC First Payments Paid in 2006 Amount | # of Claims | Pre-Petition Paid 2006 Amount | # of Claims | Total PI Claims Paid 2006 Amount | # of Claims |
|---|---|---|---|---|---|---|---|---|---|---|
| Jan-06 | $2,517,825.00 | 1,695 | $9,109,007.00 | 7,512 | $2,745,185.00 | 1,736 | $0.00 | 0 | $14,372,017.00 | 10,943 |
| Feb-06 | $2,053,675.00 | 1,116 | $4,286,972.00 | 3,261 | $2,295,510.00 | 1,311 | $0.00 | 0 | $8,636,157.00 | 5,688 |
| Mar-06 | $1,422,475.00 | 902 | $2,709,189.00 | 2,283 | $2,027,770.00 | 1,283 | $0.00 | 0 | $6,159,434.00 | 4,468 |
| Apr-06 | $2,421,700.00 | 1,624 | $7,200,329.00 | 5,449 | $1,550,376.00 | 942 | $0.00 | 0 | $11,172,405.00 | 8,015 |
| May-06 | $1,885,700.00 | 1,203 | $9,824,699.00 | 7,440 | $1,637,851.00 | 966 | $0.00 | 0 | $13,348,250.00 | 9,609 |
| Jun-06 | $2,298,100.00 | 1,518 | $5,338,010.00 | 3,870 | $2,053,449.00 | 1,185 | $0.00 | 0 | $9,689,559.00 | 6,573 |
| Jul-06 | $2,099,675.00 | 1,474 | $4,046,758.00 | 2,899 | $1,678,374.00 | 965 | $0.00 | 0 | $7,824,807.00 | 5,338 |
| Aug-06 | $2,328,250.00 | 1,606 | $3,903,146.00 | 1,644 | $2,315,818.00 | 1,102 | $0.00 | 0 | $8,547,214.00 | 4,352 |
| Sep-06 | $1,685,400.00 | 1,123 | $6,907,884.00 | 3,434 | $1,883,858.00 | 861 | $0.00 | 0 | $10,477,142.00 | 5,418 |
| Oct-06 | $1,357,475.00 | 683 | $4,867,214.00 | 2,407 | $1,266,921.00 | 590 | $0.00 | 0 | $7,491,610.00 | 3,680 |
| Nov-06 | $2,993,800.00 | 2,486 | $3,858,437.00 | 1,890 | $1,541,113.00 | 709 | $0.00 | 0 | $8,393,350.00 | 5,085 |
| Dec-06 | $1,353,650.00 | 1,009 | $3,962,519.00 | 2,089 | $1,131,436.00 | 569 | $0.00 | 0 | $6,447,605.00 | 3,667 |
| **Total PI Paid Claims 2006** | $24,417,725.00 | 16,439 | $66,014,164.00 | 44,178 | $22,127,661.00 | 12,219 | $0.00 | 0 | $112,559,550.00 | 72,836 |

| Month | PD First Payments Paid in 2006 Amount | # of Claims | PD Second Payments Paid in 2006 Amount | # of Claims | PD Settlements Paid in 2006 Amount | # of Claims | Total PD Claims Paid in 2006 Amount | # of Claims | Total PI and PD Claims Paid 2006 Amount | # of Claims |
|---|---|---|---|---|---|---|---|---|---|---|
| Jan-06 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $14,372,017.00 | 10,943 |
| Feb-06 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $8,636,157.00 | 5,688 |
| Mar-06 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $6,159,434.00 | 5,688 |
| Apr-06 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $11,172,405.00 | 4,468 |
| May-06 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $13,348,250.00 | 8,015 |
| Jun-06 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $9,689,559.00 | 9,609 |
| Jul-06 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $7,824,807.00 | 6,573 |
| Aug-06 | $0.00 | 0 | $0.00 | 0 | $221,221.05* | 1 | $221,221.05 | 1 | $8,768,435.05 | 5,338 |
| Sep-06 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $10,477,142.00 | 4,353 |
| Oct-06 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $7,491,610.00 | 5,418 |
| Nov-06 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $8,393,350.00 | 3,680 |
| Dec-06 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $6,447,605.00 | 5,085 |
| **Total PD Claims Paid 2006** | $0.00 | 0 | $0.00 | 0 | $221,221.05 | 1 | $221,221.05 | 1 | $112,780,771.05 | 72,837 |

*Additional Settlement Payment Pursuant to Settlement Agreement with Claimant.

EXHIBIT "4"

To:     All Celotex Asbestos Trust Claimant Counsel

From:   John L. Mekus, Executive Director

Re:     Notice of Trust Policy Regarding Acceptance of Medical Reports

Date:   October 18, 2005


In July 2005 the Celotex Asbestos Settlement Trust placed an administrative hold on claims that relied upon medical reports by certain doctors and screening companies challenged in the Silica MDL proceedings in Corpus Christi, Texas. The hold extended to claims in process, claims settled but not yet paid anything, and claims settled but not yet paid a second installment IRC payment. The purpose of this letter is to update the status of those claims and to announce the Trust's determination to no longer accept medical reports from certain doctors and screeners.

### The Listed Doctors And Screeners

| | |
|---|---|
| Dr. James Ballard | Dr. Barry Levy |
| Dr. Kevin Cooper (of Pascagoula, Mississippi) | Dr. George Martindale |
| Dr. Todd Coulter | Dr. W. Allen Oaks |
| Dr. Andrew Harron | Netherland & Mason, Inc. |
| Dr. Ray Harron | Respiratory Testing Services, Inc. |
| Dr. Glynn Hilbun | Occupational Diagnostics |

### Claims Newly Filed

Until further notice, effective immediately all claims filed with the Trust must not rely upon medical reports by any of the Listed Doctors And Screeners. Any claim filed that relies on a medical report by these doctors or screeners shall be treated as **deficient** and the claimant will be so notified. Any such deficiency may be cured by the claimant's submission of a medical report to replace the one by a Listed Doctor And Screener.

### Claims Already Filed That Have Not Yet Been Settled

Until further notice, effective immediately all claims already filed with the Trust but not yet settled that rely upon medical reports by any of the Listed Doctors And Screeners shall be treated as **deficient** and the claimant shall be so notified. For this purpose, a claim has not been settled unless the Trust has received a release signed by the claimant as of the date of this notice. Any such deficiency may be cured by the claimant's submission of a medical report to replace the one by a Listed Doctor And Screener.

## Claims Already Settled But No Payment Has Been Made

Until further notice, all claims already settled by the Trust that rely upon medical reports by any of the Listed Doctors And Screeners shall remain on administrative **hold**. For this purpose, a claim has been settled if the Trust has received a release signed by the claimant as of the date of this notice.

## Claims Awaiting Second IRC Installment Payment

Until further notice, all settled claims awaiting a second installment payment that rely upon medical reports by any of the Listed Doctors And Screeners shall remain on administrative **hold**.

## Lifting Administrative Hold

The Trust shall lift the administrative hold described herein if: (1) the claimant submits a new medical report to replace the one by a Listed Doctor And Screener; or (2) the claimant demonstrates that a medical report by any of the Listed Doctors And Screeners submitted in connection with a claim was not relied upon by the doctor providing the diagnosis of the asbestos-related disease for the claim; or (3) after re-reviewing the medical evidence submitted with all settled claims, the Trust determines that a medical report by any of the Listed Doctors And Screeners submitted in connection with a settled claim was not relied upon by the doctor providing the diagnosis of the asbestos-related disease for the claim.

The Trust may lift the administrative hold described herein after further review, including audit of supporting tests, audit of x-rays, or direct inquiry of doctors or screeners.

## Rescission Notice

If the administrative hold on any claim is not lifted as described above, after a reasonable period of time the Trust may elect to rescind its settlement of such a claim. **All claimants whose claims are now subject to the administrative hold described herein are hereby on notice that the Trust may assert a right to rescind its settlement of their claims.**

If you have any questions regarding this notice, please contact the Celotex Trust Helpline at (888) 872-3160.